**E-FILED**
Friday, 29 August, 2008  01:49:43 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | |
|---|---|
| CRAIG STONE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No.  07-3110 |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY ADMINISTRATION, ) | |
| ) | |
| Defendant. ) | |

## <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

Plaintiff Craig Stone appeals from a final Decision of the Social Security Administration (SSA) denying his application for Disability Insurance Benefits (DIB) under Chapter II of the Social Security Act, 42 U.S.C. § 423.  Stone brings this appeal pursuant to 42 U.S.C. § 405(g). The parties have filed cross-motions for summary judgment or affirmance pursuant to Local Rule 8.1(D).  <u>Motion for Summary Judgment (d/e 15)</u>; <u>Motion for Summary Affirmance (d/e 17)</u>.  Stone asks this Court to find him disabled.  The Court cannot do so based on the limited evidence presented below, but for the following reasons, the Court reverses the

decision of the Commissioner and remands this matter for further proceedings.

BACKGROUND

Stone applied for DIB and SSI on June 2, 2004.  He alleged that a back injury he suffered in December of 2003 rendered him disabled.  The SSA denied his claims initially and on reconsideration.  Stone requested a hearing, which was held May 23, 2006.  On May 24, 2006, an Administrative Law Judge (ALJ) issued a Decision denying Stone's application.  The Appeals Council denied Stone's request for review, and Stone now seeks judicial review.

A.   MEDICAL HISTORY

The ALJ's Decision below did not rely on evidence of Stone's medical condition, but to provide context, some discussion of his medical history is necessary.  On December 29, 2003, Stone underwent a lumbar fusion surgery and placement of disk cages.  The surgery, performed by Dr. Jose Espinosa and a Dr. Freitag, was intended to treat chronic lower back pain.  For years before the surgery, Stone suffered from lower back pain and decreased mobility, but he alleges that since December 29, 2003, these conditions have disabled him.  Essentially, Stone asserts that the surgery

only increased his pain and immobility.  Stone also asserts that he suffers from a sleep disorder related to pain medication and had been diagnosed with bi-polar disorder.

In 1999, Stone began working at the Illinois Secretary of State's Office.  Previously, he held several other positions, including a job as a car salesman.  In December 2003, Stone was a Secretary of State account technician, which required him to sit at a desk most of the day performing tasks such as data entry.  Stone did not return to work immediately following his surgery.  Initially, he appeared to respond well to the surgery, but eventually his condition deteriorated.

Stone began physical therapy soon after surgery, but reported that pain kept him from doing all of the stretches and exercises prescribed.  In February of 2004, he began a light exercise routine and complained that this routine aggravated his condition and produced symptoms similar to his pre-operative pain.  Stone's doctors initially prescribed Fentanyl patches and OxyContin tablets for his pain.

On October 20, 2004, Dr. Espinosa advised Stone that he could return to work part-time on November 21, 2004.  It is unclear exactly when Stone returned to work, but by December 2, 2004, he was back at the

Secretary of State's Office as an account technician.  He had been out of work for around 11 months, but less than 12 months.

In 2005, Stone worked from the beginning of the year until March 25, 2005.  Several of his doctors reported concern over whether Stone was abusing his pain medication during this time.  Stone consulted Dr. J.K. Villegas, who refused to provide any narcotic medications but referred Stone to a pain clinic.  The pain clinic also reportedly refused to prescribe narcotics, but treated Stone with injections.  Stone then consulted a Dr. Naalah who initially prescribed OxyContin, but then refused to continue treating Stone based on suspicions that Stone was abusing his medication. In March of 2005, Dr. Espinosa referred Stone to a detox center.  In May of 2005, Dr. Espinosa reported that Stone refused to follow the detox center protocol and so discontinued his treatment there.  Dr. Espinosa prescribed Methadone and took Stone off his other pain medications.

It is unclear when Stone returned to work at the Secretary of State's Office after the detox treatment, but by June 28, 2005, he was working part-time.  Beginning in September of 2005, Dr. Michael Sheedy also treated Stone for his pain.  Dr. Sheedy also initially refused to provide additional narcotics, and also referred Stone to the pain clinic.  Dr. Sheedy's notes

report that the pain clinic refused to see Stone, however, because Stone previously had been referred by four or five different doctors and had proved noncompliant.  Dr. Sheedy attempted to treat Stone with non-narcotic pain medications.  Eventually, however, he started Stone on a narcotic Fentanyl patch.  Despite the patch, Stone continued to report pain. By November 7, 2005, Stone was again working full-time, and he continued to work through the end of the year.  He continued to use the narcotic patches.

B.  INITIAL SSA DECISIONS

On October 22, 2004, the SSA concluded that Stone's condition was not expected to keep him from working for 12 consecutive months.  It held:

> In order to be eligible for disability benefits, your condition must keep you from doing any work for 12 consecutive months. The medical evidence in file indicates that your condition is severe and keeps you from working at this time.  However, based on your description of the job of automobile salesman, we have concluded that you will have the ability to return to that type of work within 12 months from the onset of your condition.

R. 28.  The SSA denied Stone's application for benefits.

On April 20, 2005, the SSA denied Stone's request for reconsideration.  It held that while the medical evidence in the file indicates

that Stone's condition "does cause some restrictions," Stone still possessed "the ability to do light/unskilled work." R. 33. The Decision noted that the SSA recognized that Stone's condition prevented him from performing his past work, but it believed Stone was still able to do other less demanding work.

C.   ADMINISTRATIVE HEARING

Stone requested an administrative hearing regarding his application. On May 23, 2006, a hearing took place via video conference. At the start of the hearing, the ALJ advised Stone of his right to counsel, but Stone opted to proceed *pro se.*

Stone was the only witness who testified at the hearing. He informed the ALJ that he was divorced with two children. He lived alone in a mobile home, at the time of the hearing; neither of his children lived with him. Stone testified that he had an Associates Degree in business and six years of college course work. Prior to this application, he had never applied for social security benefits.

Stone worked in the Accounting and Revenue Department of the Illinois Secretary of State's Office; this job provided all of his income. He testified that at the time of the hearing, he worked five days a week, from

8:30 a.m. to 4:30 p.m.  He worked at a desk, completing tasks such as data entry.  Stone initially began working at the Secretary of State's Office in April of 2000, but he did not begin full-time work there until six or seven months later.  Stone told the ALJ that from the spring of 2001 until the time of the hearing, he worked full-time for the Secretary of State's Office except for periods of time related to his back problems and surgery.  He did not specify when those periods occurred or how long they lasted.

Stone testified that on April 20, 2005, he received a letter from the SSA stating that while the SSA agreed that the medical evidence shows that he is not capable of performing his Secretary of State job, he could perform other less demanding work.  Stone said he could not understand how any job could be less demanding than his Secretary of State job.  He thought it was impossible for him to sell cars, as the SSA suggested, and he wrote a letter to Senator Richard Durbin about his situation.  In June of 2005, Stone testified that Senator Durbin's office advised him that he likely would have to wait another 17 months for a review of the SSA's Decision.  Stone decided he could not survive or provide for his children and ex-wife for 17 months without income, and his Secretary of State job offered the lightest possible work.

Stone testified that he went to his personal physician, Dr. Villegas, and asked the doctor to provide him extreme pain medication so that he could try to work his state job. According to Stone, Dr. Villegas refused to prescribe the level of pain medication Stone requested, and he referred Stone to a clinic specializing in pain treatment. The clinic refused to provide Stone the medication he requested. Eventually, however, Stone was placed on prescription patches for the pain, which he continued to use at the time of the hearing.

Stone testified that based on this heavy medication and his personal high tolerance for pain, he has been able to work at the Secretary of State's Office. He explained, however, that even with the medication, he is in constant pain. He never takes enough to mask the pain completely, because his doctor will not prescribe that high a dosage. At lunch, he lies under his desk at work with an ice pack to help him get through the rest of the day. He testified that he is only working this much because he cannot afford to stop doing so.

After Stone testified, the ALJ concluded the hearing. A vocational expert was present at the hearing, but the ALJ did not ask him to testify.

D.    THE ALJ'S DECISION

The ALJ concluded that Stone was not disabled under the Social Security Act and issued his Decision on May 24, 2006.  In reaching this decision, the ALJ discussed the five-step analysis set out in 20 C.F.R. §§ 404.1520 & 416.920.  The first step asks whether a claimant is unable to engage in substantial gainful activity.  If a claimant has engaged in substantial gainful activity over a 12-month period following the onset of his alleged disability, he is not disabled for social security benefit purposes.  If a claimant has not engaged in substantial gainful activity over a 12-month period, he may be disabled, depending on the details of his impairment and his ability to work.  The ALJ concluded here that because he could not identify any 12-month period during which Stone's earnings fell under a monthly amount set by SSA regulations, Stone must have engaged in substantial gainful activity.

Based on his review of the record, the ALJ found that Stone returned to work sometime in November 2004.  According to IRS records, in 2004, Stone earned $2,235.63.  The ALJ calculated that if Stone worked two months in 2004, he averaged $1,117.82 per month.  According to SSA regulations, a person who earned $810.00 a month in 2004 was engaged in

gainful activity.

In 2005, the ALJ found that Stone worked from the beginning of the year until March 25, 2005, when he stopped working to obtain substance abuse treatment for addiction to prescription pain medication.  Again, the ALJ noted that it was unclear when Stone returned to work after treatment, but by June 28, 2005, he was working part-time.  By November 7, 2005, Stone again had switched to full-time work, and he continued to work through the end of the year.  In 2005, Stone reported earnings of $16,050.30 to the IRS.  The ALJ found that averaging his wages over the entire year, Stone earned $1,337.52 per month.  Subtracting the months he was in narcotics treatment, Stone earned even more per month.  According to SSA regulations, a person who earned $830.00 a month in 2005 was engaged in gainful activity.

Thus, the ALJ concluded that from December 2004 through March 25, 2005, Stone was engaged in gainful activity.  Because Stone stopped work again before completing six months of work, the ALJ analyzed whether the December 2004 - March 2005 period could be considered an unsuccessful work attempt.  Under 20 C.F.R. § 404.1574(c)(4), the SSA considers work attempts of between three and six months unsuccessful work

attempts if the claimant ceased working because of an impairment or the removal of a special condition related to his impairment and: (1) the claimant was frequently absent from work because of his impairment; (2) the claimant's impairment made his performance unsatisfactory; (3) the claimant worked only during a temporary remission of his impairment; or (4) the claimant worked under special conditions essential to his performance, and these conditions were removed. The ALJ found that while Stone stopped work for an impairment, no evidence suggested that during the period of December 2004 through March 2005, he was frequently absent, his work performance had been unsatisfactory, he had worked only in remission, or that he worked under essential special conditions that were removed. The ALJ therefore concluded that the initial period of Stone's return to work was not an unsuccessful work attempt. It could be considered substantial gainful activity.

The ALJ found that Stone also was engaged in substantial gainful activity from June 28, 2005, through the date of the hearing, May 23, 2006. He did not analyze Stone's income in 2006, likely because IRS records were not yet available for that year, but he noted that Stone testified that he was performing essentially the same work in 2006 that he performed in 2005.

The ALJ found it reasonable to conclude that Stone's 2006 wages up to the date of the hearing would be similar to those of 2005, and therefore his 2006 work also would be gainful activity.  The ALJ could not identify a full 12-month period during which Stone failed to engage in substantial gainful activity and thus, found that Stone had not met his burden at the first step of the sequential analysis.  Because the ALJ found that Stone had engaged in substantial gainful activity, he found it unnecessary to continue to the next four steps.  The ALJ held that Stone was not disabled.

E.      <u>THE APPEALS COUNCIL</u>

On February 2, 2007, the Appeals Council denied Stone's request for a review of the ALJ's Decision.  Stone argued that his medical records clearly demonstrated that he was disabled.  He objected to the ALJ's use of income to assess substantial gainful activity and argued that he was only able to work by taking high levels of pain medication.  The Appeals Council found no reason under SSA rules to review the ALJ's Decision.

<u>ANALYSIS</u>

Stone now asks this Court to find him disabled.  He argues that the ALJ incorrectly found that he failed to go for a 12-month period without engaging in substantial gainful activity.  Because the Court finds that the

ALJ neglected to consider whether Stone rebutted the SSA regulatory presumption of gainful employment, this case is remanded to the ALJ for further consideration.

The Court reviews the ALJ's Decision to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).  This Court must accept the ALJ's findings if they are supported by substantial evidence and may not substitute its judgment for that of the ALJ.  <u>Delgado v. Bowen</u>, 782 F.2d 79, 82 (7th Cir. 1986).  The ALJ must, at least minimally, articulate his analysis of all relevant evidence, however.  <u>Herron v. Shalala</u>, 19 F.3d 329, 333 (7th Cir. 1994).  The Court must be able to "track" the ALJ's analysis to determine whether the ALJ considered all important evidence.  <u>Diaz v. Chater</u>, 55 F.3d 300, 308 (7th Cir. 1995).  Where the Court cannot, and the record does not conclusively demonstrate that the claimant is disabled, the Court must remand for further proceedings; these proceedings can include the taking of additional evidence.  <u>Wilder v. Chater</u>, 64 F.3d 335, 338 (7th Cir. 1995).

A claimant is disabled for Social Security purposes if he demonstrates

an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, an ALJ must follow a five-step analysis.  The analysis requires a sequential evaluation of: (1) whether claimant is engaged in substantial gainful activity; (2) the severity of claimant's impairment; (3) whether the impairment equals a listed impairment in Appendix 1; (4) whether the impairment prevents claimant from doing his past relevant work; and (5) whether claimant can perform other work, given his residual functional capacity, age, education, and past work experience.  20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4); Clifford v. Apfel, 227 F.3d 863, 868 (7th Cir. 2000).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The SSA has the burden on the last step.  Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).

At step one, Stone was required to show that for at least a continuous 12-month period following the onset of his alleged disability, he was not engaged in substantial gainful activity.  Barnhart v. Walton, 535 U.S. 212,

217-22 (2002).  Work need not be full-time to constitute substantial gainful activity.  <u>Dotson v. Shalala</u>, 1 F.3d 571, 575-76 (7th Cir. 1993).  To determine whether a claimant was engaged in substantial gainful activity, the ALJ must evaluate whether his earnings exceeded a monthly guideline set by the SSA.  20 C.F.R. § 404.1574(b); <u>see also</u> <u>Program Operation Manual System (POMS)</u> DI 10501.015, <u>available at</u> https://secure.ssa.gov/apps10/poms.nsf/aboutpoms; <u>Washington State Dept. of Social Servs. v. Keffeler</u>, 537 U.S. 371, 385 (2003).  For 2004, the guideline was $810.00 per month; for 2005, it was $830.00 per month; for 2006, it was $860.00 per month.  <u>POMS</u> DI 10501.015(B)(Table 2).

The SSA also sets a particular method for calculating the claimant's monthly wages.  First, the SSA must identify Stone's gross earnings, as reported by the Internal Revenue Service.  <u>See</u> <u>Social Security Ruling (SSR) 83-33</u>, <u>available at</u> http://www.ssa.gov/OP_Home/rulings/.  Then, the SSA deducts the value of any subsidized earnings provided by the employer and the amount of certain impairment-related work expenses paid by the employee.  <u>Id.</u>  Standard payroll deductions such as taxes, insurance premiums, and pension payments are not deductible.  <u>Id.</u>  What remains after the appropriate deductions is the claimant's monthly wage.

Here, the ALJ determined that under the SSA regulations, after Stone returned to work in 2004, he earned an average of $2,235.63 per month. In 2005, he earned an average of $1,337.52.  In 2006, the ALJ reasoned that Smith likely earned an income similar to that in 2005.  The ALJ concluded that Stone earned more than the SSA guideline amounts, and therefore he engaged in substantial gainful activity.

Stone contends that the Court should not rely on the SSA method of calculating his monthly income, because the SSA calculations include amounts deducted from his paycheck each month, such as insurance premiums and retirement contributions.  Yet, Social Security Rulings, including the method calculating income, "are binding on all components of the Social Security Administration."  20 C.F.R. § 402.35(b)(1).  This Court's task is to evaluate whether the ALJ properly applied such rulings and precedent.  Here, the ALJ followed the proper calculation.  Stone may disagree with it, but it was binding.

Stone's second argument is more persuasive, however.  Stone contends that even if he engaged in substantial gainful activity, he was able to do so only because he was desperate for income and so had his doctor heavily medicate him against the pain associated with his condition.  He argues that

only this heavy medication and his high tolerance for pain, in the face of a desperate situation, made it possible for him to work.

The ALJ concluded that legally, Stone's condition is irrelevant at the first stage of the analysis, but his opinion did not account for Seventh Circuit recognition of an exception for claimants working beyond their abilities out of desperation.  The ALJ correctly noted that SSA regulations hold that "[i]f you are working and the work you are doing is substantial gainful activity, we will find that you are not disabled regardless of your medical condition or your age, education, and work experience."  20 C.F.R. §§ 404.1520(b), 416.920(b).  In Jones ex rel. Jones v. Shalala, the Seventh Circuit applied that regulation, concluding that "[i]f you are substantially gainfully employed, that is the end of your claim, even if you have compelling medical evidence that you really are disabled."  Jones, 21 F.3d 191, 193 (7th Cir. 1994).  Under this view, the extent of a claimant's disability is relevant only at the subsequent stages of analysis; he must pass the first hurdle before the Court can consider the evidence of his disability. Id. at 192 (holding that if a claimant is currently engaged in substantial gainful activity, "his claim is rejected without consideration of the severity of his mental or physical impairment or how disabling the impairment is").

Yet, the Seventh Circuit also has held that "employment is not proof positive of ability to work, since disabled people, if desperate (or employed by an altruist) can often hold a job."  Wilder v. Apfel, 153 F.3d 799, 801 (7th Cir. 1998); see also Gentle v. Barnhart, 430 F.3d 865, 866 (7th Cir. 2005) ("A person can be totally disabled for purposes of entitlement to social security benefits even if, because of an indulgent employer or circumstances of desperation, he is in fact working.").  The Seventh Circuit has noted the "tension" between this line of cases and the SSA regulation making gainful activity proof positive of a claimant's ability, and it has speculated that "[t]he regulation may simply reflect a commonsense presumption that to work implies a capacity to continue working, and the presumption fails if the applicant is no longer working."  Gentle, 430 F.3d at 867.

In Jones, the Seventh Circuit concluded that where a claimant has earned more than the SSA guidelines set for gainful activity, "a rebuttable presumption of substantial gainful activity"exists.  Jones, 21 F.3d at 192. In a small set of circumstances, claimants have been able to rebut that presumption:

Maybe his boss feels desperately sorry for him and is retaining

him on the payroll even though he is incapable of working.
That act of charity ought not be punished by denying the
employee benefits and thus placing pressure on the employer to
retain an unproductive employee indefinitely. . . .  Maybe . . . a
seriously disabled worker is able to work only by dint of his
extraordinary determination and the extraordinary assistance
extended to him by kindly fellow workers.  Or, since $500 a
month [the applicable guideline at the time of the opinion] is
nowadays hardly a living wage, we suppose that even a terribly
disabled person might be able to scrape that much together by
occasional work done at great personal cost, and yet by any
realistic criterion he would be permanently disabled and should
not be punished for his extraordinary exertions by being denied
disability benefits.  . . .  These are all cases in which although the
disabled person is gainfully employed, the gainful employment
is not substantial when viewed in terms of the purpose of the
statute, because were it not for effort by himself or others far
beyond the call of duty he would not be employed at all.

Id. at 192-93.  A claimant may rebut a presumption based on earnings with

evidence that he is unable to perform his job without extraordinary special

assistance, or that he is able to perform at that level only for a brief period

of time.  Id. at 193.  According to the Seventh Circuit, "even a desperate

person might not be able to maintain the necessary level of effort

indefinitely," and "[a] disabled person should not be punished for heroic

efforts to work by being held to have forfeited his entitlement to disability

benefits should he stop working."  Hawkins v. First Union Corp. Long Term

Disability, 326 F.3d 914, 918 (7th Cir. 2003).

Stone presented the ALJ with evidence that he was working only by virtue of extensive pain medication, and only out of desperation.  His evidence was not necessarily conclusive, but it was sufficient to require the ALJ to discuss whether Stone was in fact capable of the work he was performing.  See Henderson v. Barnhart, 349 F.3d 434, 436 (7th Cir. 2003). While Stone bore the burden on this issue, the ALJ was required to articulate, at least minimally,  his analysis of all relevant evidence.  Herron, 19 F.3d at 333.  Here, the ALJ failed to consider any evidence of Stone's condition.   He treated the SSA regulations as conclusive, instead of rebuttable.  The Court makes no judgment on whether Stone's employment, while gainful, was not substantial when viewed in terms of the purpose of the statute, but the ALJ should have done so.  See Jones, 21 F.3d at 193. On remand, the ALJ must address this issue.

Finally, it should be noted that Stone requests punitive damages.  No legal authority allows the Court to award punitive damages in a social security case.  The Court denies this request.

THEREFORE, Stone's Motion for Summary Judgment (d/e 15) is ALLOWED in part and DENIED in part, and Defendant's Motion for Summary Affirmance (d/e 17) is DENIED.   The Court denies Stone's

request for a finding of disability and his request for punitive damages, but allows his request for a reversal of the Commissioner's Decision.   The Decision of the Commissioner is reversed and remanded for further proceedings consistent with the Opinion, pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS THEREFORE SO ORDERED.

ENTER:   August 28, 2008

        FOR THE COURT:

                      _____s/  Jeanne E. Scott_____
                                    JEANNE E. SCOTT
                       UNITED STATES DISTRICT JUDGE